# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

UNITED STATES OF AMERICA,

v.  CRIMINAL ACTION NO. 2:19-cr-00288

JUSTIN MICHAEL DAVIS,

## MEMORANDUM OPINION AND ORDER

Pending before the court is Defendant's Motion to Suppress. [ECF No. 24]. The court held a hearing on this Motion on February 6, 2020 and ordered additional briefing. Defendant and the Government have submitted additional briefs, and the matter is now ripe for review. For the following reasons, the Motion is **GRANTED**.

I.  Background

The Defendant seeks to suppress all physical evidence that was seized as a result of the October 4, 2019 stop and subsequent search of his person and drawstring backpack by the Parkersburg Police.[1] At the suppression hearing, the court heard testimony from Officer Timothy Kashorek and Defendant Justin Davis. The parties agree that at approximately 12:39 am, while driving west on the 900 block of 31st

---

[1] Mr. Davis specifically seeks the suppression of a Smith and Wesson SD 9mm handgun with a missing serial number found in his backpack and a Smith and Wesson 9mm handgun magazine with six unfired cartridges found in his front pants pocket.

Street in Parkersburg, West Virginia, Officer Kashorek observed an individual later determined to be Justin Michael Davis. Mr. Davis, a homeless individual, was sitting on his bicycle, not using it, in an ally on the north side of the street when Officer Kashorek drove by. At the time Officer Kashorek observed him, Mr. Davis lacked a front-facing head lamp. A head lamp is required by West Virginia law and Parkersburg local ordinance when a bicycle is in use and on a public street or bicycle path—not when in an alley. The violation carries a maximum $50 fine and no jail time.

Officer Kashorek testified that after seeing Mr. Davis without a head lamp in the alley, he decided to initiate a traffic stop. *See* Tr. Mot. Suppress 29:20–23 ("Q. And the sole reason that you wanted to conduct the traffic stop at this point was the lack of a light on the front of the bike, right? A. Yes.").[2] To conduct the traffic stop, Officer Kashorek turned his vehicle around, drove back to Defendant, and turned on his emergency lights. At this point, the Government and Defendant's stories diverge.

---

[2] Officer Kashorek testified during the hearing to the following:

> Q. And so what you decided to do is you decided to go on down the street and turn around. And it looks like there's a turning area approximately right here? A. Yes. Q. And that's where you turned in to turn around. And at that point had you made up your mind that you were going to conduct a stop of this bicycle? A. Yes. Q. So before you were able to observe my client on a bicycle with a red rear light, you already knew you were going to pull him over? A. Yes. Q. By the time the bike pulled out, they were going the opposite direction on 31st Street, correct? A. Yes. Q. And at that point they're moving away from you, right? A. Yes. Q. And the sole reason that you wanted to conduct the traffic stop at this point was the lack of a light on the front of the bike, right? A. Yes.

Tr. Mot. Suppress 29:3–23.

Officer Kashorek testified that after he turned the car around and drove towards Mr. Davis in the alley, Mr. Davis pulled out of the alley onto 31st street and started pedaling faster, riding east in the opposite direction of him. Officer Kashorek admitted that he could not see the front of the bicycle at this point to see whether Mr. Davis had turned on a head lamp. *See* Tr. Mot. Suppress 29:20–23 ("Q. Now, by the time the person pulled out, they could have turned on a light as they were driving, right, or as they were riding their bike away from you? A. It is within the realm of possibility."). Officer Kashorek testified he then observed that Mr. Davis did not have a red reflector on the back of his bicycle—only a single red light. Even so, Officer Kashorek stated he already had decided to pull over Mr. Davis before he observed the lack of rear red reflector. *See* Tr. Mot. Suppress 34:17–20 ("Q. "[Y]ou already had made the decision to initiate the stop prior to seeing whether he even had a rear reflector or not? A. Yes."). Officer Kashorek got behind Mr. Davis and turned on his headlights. Officer Kashorek did not turn on his sirens, did not use his intercom, and did not roll his window down to ask Mr. Davis about his head lamp. Officer Kashorek was driving about 20 miles an hour during the incident.

Officer Kashorek then testified that he followed Mr. Davis onto Avery Street, left onto 30th Street, then right into an alley before reaching Emerson Avenue. He continued following Mr. Davis as the alley turned back west in between 29th and 30th Streets. At this point, Officer Kashorek testified that he pulled up beside Mr. Davis, opened his driver's side door, and asked Mr. Davis to pull over, to which Mr.

3

Davis replied something unintelligible.[3] Then, a local resident ran out of his house and knocked Mr. Davis off his bicycle. Mr. Davis got up, allegedly began to run, and was tackled again by Officer Kashorek. Officer Kashorek testified that Mr. Davis "didn't make it very far" before he tackled him. *See id.* at 9:2–3. Officer Kashorek and Mr. Davis struggled for about one to two minutes before Officer Kashorek subdued and handcuffed him with the help of another officer. *See id.* at 9:15–17 ("As I'm attempting to subdue him and put his hands behind his back, he kept pulling his hands underneath of him as if he was reaching towards his waistband."). According to Officer Kashorek, he gave Mr. Davis repeated loud commands to put his hands behind his back, which he did not comply with. During the struggle, Officer Kashorek testified Mr. Davis was also "grabbing at items on the other officer's belt," and that he grabbed "the other officer's pepper spray, leather pouch and ripped it off the belt, as well as the officer's key chain." *See id.* at 10:2–8.

Officers searched Mr. Davis and his drawstring backpack he had been wearing, which had fallen off during the struggle and was on the ground in the alley, as a search incident to his arrest. Police recovered a Smith and Wesson 9mm handgun magazine with 6 unfired cartridges from his front pants pocket and a Smith and Wesson SD 9mm handgun with a missing serial number from the drawstring backpack. Officers also recovered a cell phone, three flashlights, and three battery chargers with charging cords, as well as other miscellaneous items.

---

[3] Officer Kashorek did not include in his original report that he opened his door and gave instructions to Mr. Davis to stop.

According to Mr. Davis, he was unaware of ever violating any bicycle laws or of fleeing an officer. In fact, Mr. Davis testified that he was well aware of the bicycle laws from friends in the area and because, just a week prior, he had been stopped at a gas station due to his front head light being barely visible on his bicycle. Mr. Davis testified that while he was at a Marathon gas station drinking a Mountain Dew and scratching a lottery ticket the week prior to the incident here, a Parkersburg police officer pulled up beside him and thanked him for having a headlight on his bicycle.[4] *See* Ex. List [ECF No. 29–3]. According to Mr. Davis, the officer said that his light seemed a little dim, but when he turned the high beam function on, he said that's too bright. The police report of the incident stated that the bike had three different lights on the front. *Id.* Nothing was mentioned regarding a red rear reflector. No citation was issued to Mr. Davis.

---

[4] The Defendant provided the police report of the incident, which includes the following:

> Dress: Dark Colored t-shirt, blue jeans, ball cap. Riding a black mountain bike with 3 different lights on the front.
>
> Comments: Subject was stopped by DWM due to the subject's lights barely being visible on his bicycle. The subject was sitting on his bicycle in the parking lot of the Marathon gas station. The subject was scratching off a lottery ticket and talking on the phone. DWM checked the subject for warrants but none were found. He advised that he had just recently got off of parole and had been staying out of trouble. He advised that he is homeless at the time and stays with friends when he can.

*See* Ex. List [ECF No. 29–3].

According to Mr. Davis, he used his cellular telephone's flashlight features as a front light and a battery-operated red rear reflector/light that his girlfriend purchased off the internet. His girlfriend had ordered him a mount for the handlebars that could hold his cellphone, and he would turn the cell phone's flashlight feature on to use as the head light. He testified that he used his red rear light as a reflector. *See id.* at 49:8 – 11 ("Q. The item in the circle is the red rear light that you're talking about? A. Yeah. You could see it's also—I had used that as a secondary reflector also. It's red."). According to Mr. Davis, when Officer Kashorek drove by him in the alley, he was in the process of putting his phone in his bicycle's bracket and turning on his phone's flashlight function before beginning to turn onto 31st Street and pedal east.

Mr. Davis testified that though he did observe Officer Kashorek's emergency lights, he did not think they were for him because he was not doing anything wrong. According to Mr. Davis, he turned his bike into the alleyway because he did not believe the officer was trying to pull him over. In fact, he tried to move out of the way for Officer Kashorek, but because 30th street was lined with cars, there was no safe place for him to pull over. *Id.* at 54:2–5 ("Q. So the entire length of 30th Street, between Avery Street and nearly all the way to Emerson, you had nowhere to pull off and get out of the way? A. No, there's cars lined up on both sides."). Mr. Davis thus continued down the street before making a right-hand turn into an alley. Mr. Davis testified that at no point did he hear any siren or any commands from Officer Kashorek. *Id.* at 51:21—24 ("Q. At any point prior to you be tackled or knocked off the bike by the plainclothes person, did you hear the police officer in the cruiser give

6

you any verbal commands? A. No."). Mr. Davis testified that he did not hear Officer Kashorek open a car door and tell him to stop. When Mr. Davis was tackled by the random citizen and then by Officer Kashorek, he did not know who either person was at the time they tackled him. It was not until the officers gave verbal commands after he was tackled the second time that Mr. Davis realized they were police officers, at which point he allowed himself to be handcuffed. According to Mr. Davis, during the struggle with Officer Kashorek, the reason Mr. Davis attempted to put his arms back underneath of him was because he could not breathe, which Officer Kashorek admits Mr. Davis told him. *See id.* 38:5–6 ("Q. And he was telling you he couldn't breathe? A. Yes.).

On November 26, 2019, a federal grand jury sitting in the Southern District of West Virginia returned a two-count indictment charging Mr. Davis with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2),2 and possession of a firearm with an obliterated serial number in violation of 18 U.S.C. §§ 922(k) and 924(a)(1).

II.     **Legal Standard**

When deciding a motion to suppress, the district court may make findings of fact and conclusions of law. *United States v. Stevenson,* 396 F.3d 538, 541 (4th Cir. 2005). During the hearing, "the credibility of the witness[es] and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. McKneely,* 6 F.3d 1447, 1452–53 (10th Cir. 1993); *see also Columbus–Am.*

*Discovery Grp. v. Atl. Mut. Ins. Co.,* 56 F.3d 556, 567 (4th Cir. 1995) ("[I]n the usual case, the factfinder is in a better position to make judgments about the reliability of some forms of evidence than a reviewing body acting solely on the basis of a written record of that evidence. Evaluation of the credibility of a live witness is the most obvious example.") (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.,* 508 U.S. 602, 623 (1993)).

The burden of proof is on the party who seeks to suppress the evidence. *United States v. Dickerson,* 655 F.2d 559, 561 (4th Cir. 1981). Once the defendant establishes a basis for his motion to suppress, the burden shifts to the Government to prove the admissibility of the challenged evidence by a preponderance of the evidence. *United States v. Matlock,* 415 U.S. 164, 177 n.14 (1974).

### III. Discussion

First of all, the court finds it prudent to note that based on the facts, this whole incident likely could have been avoided if Officer Kashorek had simply rolled down his window or used his intercom to ask Mr. Davis if he had his head lamp turned on. Indeed, Officer Kashorek agreed that "voluntary police/citizen encounters are typically safer for the officer" and "citizens tend to react more favorably" than involuntary encounters, such as a vehicle stop. *See* Tr. Mot. Suppress 32:16–23. However, Officer Kashorek decided to pursue Mr. Davis and ultimately tackle and subdue him, based on his initial belief that Mr. Davis was violating a bicycle law that carries a $50 fine and no jail time. As such, the court now must decide whether Officer Kashorek had reasonable suspicion to initially conduct the traffic stop of Mr. Davis.

Next, the court must consider whether events after the initiation of the traffic stop but before Mr. Davis was seized provided reasonable suspicion for Officer Kashorek to stop Mr. Davis.

### a) The initiation of the traffic stop

"A reasonable suspicion is demonstrated when an officer is able to point to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity." *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2012) (internal quotations removed). "When an officer has reasonable suspicion of criminal activity, he may detain the suspect so as to permit the officer to allay the suspicion." *Id.* Whether a stop is supported by reasonable suspicion is measured by the "totality of the circumstances," including the officer's knowledge at the time of the stop and any reasonable inferences derived therefrom. *United States v. Sokolow*, 490 U.S. 1, 8 (1989). An individual is seized in violation of the Fourth Amendment when there is "both a 'show of authority' from law enforcement officers and 'submission to the assertion of authority' by the defendant." *United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).

"An officer's initial decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018) (internal quotations removed). Pretextual stops are valid under an objective test, which asks whether the officer validly could have stopped the car for a traffic violation, even if he would not have

9

done so but for his unsubstantiated suspicions of other criminal activity. *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993). Such a limited detention does not become "unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity," as long as the stop was justified at its inception. *Id.* "In other words, pretextual stops are valid, so long as the motorist actually committed a traffic violation." *Wolschlager v. Anderson*, No. 05-10252BC, 2007 WL 496670, at *7 (E.D. Mich. Feb. 12, 2007) (citing *United States v. Ferguson,* 8 F.3d 385, 391 (6th Cir.1993) (*en banc*)).

In this case, Officer Kashorek lacked reasonable suspicion to believe that Mr. Davis was violating West Virginia and Parkersburg traffic laws when he initiated the traffic stop of Mr. Davis. West Virginia and Parkersburg laws forbid bicyclists from using a bicycle at night without a front head lamp when the bicycle is on a public street, highway, or bicycle path.[5] *See* W.Va. Code § 17C-11-7(a); Parkersburg City Ordinance 373.13; *see also* W. Va. Code § 17C-11-1(c); Article 373.01; Ex. 1 [ECF No. 25] 1.[6] The parties do not dispute that when Officer Kashorek first observed Mr. Davis

---

[5] W.Va. Code § 17C-11-7(a) states: "Every bicycle when in use at nighttime shall be equipped with a lamp on the front which emits a white light visible from a distance of at least five hundred feet to the front and with a red reflector on the rear of a type approved by the department which shall be visible from all distances from fifty feet to three hundred feet to the rear when directly in front of lawful upper beams of head lamps on a motor vehicle. A lamp emitting red light visible from a distance of five hundred feet to the rear may be used in addition to the red reflector."

Parkersburg City Ordinance 373.13 tracks the language of W.Va. Code § 17C-11-7(a), and is attached to this motion as Exhibit A. West Virginia Code § 17C-2-8(a)(8) authorizes local authorities, such as the City of Parkersburg, to regulate the operation of bicycles.

[6] 373.01 Code Application to Bicycles:

and decided to initiate the traffic stop, Mr. Davis was sitting in the alleyway and not breaking any laws. *See* Tr. Mot. Suppress 28:9–13 ("Q. Now, a bike—would you agree with me a bike sitting in an alleyway that's not moving and the alleyway is not a public street, that bike is not required to have a headlight on at that time, correct? A. Correct."). Officer Kashorek also testified that he did not have any reason to think that Mr. Davis was engaged in other criminal activities when he made his decision to pull him over. *See* Tr. Mot. Suppress 32:13–15 ("Q. But you didn't have any other activities to suspect that Mr. Davis was up to at that point, did you? A. Not at the time."). Therefore, Officer Kashorek lacked any reasonable suspicion to think Mr. Davis was violating a traffic law or that "criminal activity was afoot" at the time he decided to initiate the traffic stop. *See Sokolow,* 490 U.S. at 7; *see also Terry v. Ohio*, 392 U.S. 1, 30 (1968); *Bowman*, 884 F.3d at 209.

It is true that Officer Kashorek's subjective intentions are irrelevant to the traffic stop of Mr. Davis. It is also true that pretextual stops are perfectly valid even if the police officer was only concerned about unsubstantiated, suspected criminal activity. *See Hassan El*, 5 F.3d at 730. However, "an investigative or pretextual stop is improper if no traffic violation has occurred." *United States v. Britton*, No. 1:19-CR-00014, 2020 WL 106728, at *2 (S.D. Ohio Jan. 9, 2020). Officer Kashorek must have had an objectively valid reason to pull over Mr. Davis *at the time of the stop*.

---

The provisions of this Traffic Code applicable to bicycles shall apply whenever a bicycle is operated upon any street or upon any public path set aside for the exclusive use of bicycles, subject to the exceptions stated herein.
(W.Va. Code § 17C-11-1(c); Ord. A-2747. Passed 8-13-74.).

Under the circumstances here, the suspicion of such minor criminal conduct is simply pretext for a search that is not otherwise lawful. Officer Kashorek may have believed that Mr. Davis would commit a traffic violation in the future by not having his head lamp turned on when he left the alley. But an observation that leads an officer to rationally conclude that a rarely enforced and extremely minor offense may shortly occur does not justify a stop.

### b) Events occurring after the activation of the police emergency lights but before the seizure

The next step is to determine whether events that occurred after Officer Kashorek initiated the traffic stop of Mr. Davis but before Mr. Davis was seized justify the stop. Although Officer Kashorek turned on his police cruiser's lights, asserting his authority, Mr. Davis was not seized until he was tackled by Officer Kashorek. *See Hodari D.*, 499 U.S. at 629 ("[H]e was not seized until he was tackled."). In an unpublished opinion, the Fourth Circuit has stated that it is proper for courts to consider as part of its reasonable suspicion analysis events that occur after the activation of police sirens but before the actual seizure of the suspect. *United States v. Holley*, 602 F. App'x 104, 107 (4th Cir. 2015).

The Government argues that when he turned his car around, Officer Kashorek did not observe a front head lamp on the bike or a rear red reflector, and therefore, he had reasonable suspicion for the stop. As stated, there is no dispute that when Officer Kashorek first observed Mr. Davis that he did not have his headlamp on and was not violating any laws. When Officer Kashorek turned around, Mr. Davis had changed from a stationary position in the alleyway to using his bicycle on the road.

However, Officer Kashorek took no steps to verify that the headlamp was indeed still off. For example, he did not drive in front of Mr. Davis to check if the head lamp had been activated. *See People v. Olmos*, No. H023834, 2003 WL 360919, at *1 (Cal. Ct. App. Feb. 20, 2003) ("However, [Officer] Prescott still could not verify if he had a forward light…Prescott pulled in about 15 feet in front of defendant, verified that the bicycle had no illuminated lamp, got out of the patrol car and asked him to stop."). Notably here, it would have been important for Officer Kashorek to verify whether Mr. Davis's head lamp was actually off because, based on the position of the police car and the police car's lights, he would not have been able to see if Mr. Davis's head lamp was still turned off. As Officer Kashorek explained, when he turned around, Mr. Davis was riding his bike away from him—thus his head lamp would have been projecting forward simultaneously with Officer Kashorek's car lights, making it impossible to see if the head lamp was on. Indeed, Officer Kashorek admitted that Mr. Davis's head lamp could have been turned on when he exited the alleyway. *See* Tr. Mot. Suppress 29:20–23 ("Q. Now, by the time the person pulled out, they could have turned on a light as they were driving, right, or as they were riding their bike away from you? A. It is within the realm of possibility.").

Thus, essentially the Government argues that reasonable suspicion exists based on an officer's speculation that someone may violate the law in the future. Because Mr. Davis did not have a head lamp turned on where it was legal to have it off, Officer Kashorek surmised that Mr. Davis did not have the head lamp turned on where it was illegal to have it off. A mere hunch or guess is not sufficient to find

13

reasonable suspicion. *See Navarette v. California*, 572 U.S. 393, 397 (2014) ("[A] mere 'hunch' does not create reasonable suspicion."). Speculation is not a substitute for evidence, and the leap the Government asks the court to make is too speculative. Though it is certainly possible that Mr. Davis did not have his front head lamp turned on, it is also equally possible that Mr. Davis did turn his head lamp on, which Officer Kashorek admitted. Without any evidence that Mr. Davis's head lamp was off, Officer Kashorek cannot have a *reasonable* suspicion that the head lamp was off.

Further, Mr. Davis's testimony lends credibility to the fact that he had turned on his head lamp when he pulled out of the alleyway. Just a week before the instant matter took place, Parkersburg Police had stopped Mr. Davis because they were concerned the head lamp on his bicycle wasn't visible enough. *See* Ex. List [ECF No. 29–3]. In fact, the police report of that encounter stated that Mr. Davis was "[r]iding a black mountain bike with *3 different lights on the front.*" *Id.* (emphasis added). Thus, there is police evidence near the time of the October 4 stop that Mr. Davis was in the practice of using a head lamp on his bicycle. Similarly here, though Mr. Davis did not have his head lamp on when he was stopped in the alleyway, he testified that he was in the process of turning on his head lamp, which meant securing his cellphone to the mount of his handlebars and turning the flashlight feature on.[7]

---

[7] Mr. Davis testified to the following:

> Q. And when he drove by, did you have your cell phone in the bracket with the light on? A. Not at that second, no. Q. Okay. What did do you after you saw him drive by? A. I just kept doing what I was doing, putting my phone in my bracket to turn the headlight on. Q. And did you turn the light on? A. Yes, sir.

14

Next, the Government argues that Officer Kashorek had reasonable suspicion to stop Mr. Davis because Mr. Davis lacked a rear red reflector. West Virginia and Parkersburg law requires all bicycles to have "a red reflector on the rear of a type approved by the department." *See* W.Va. Code § 17C-11-7(a); Parkersburg City Ordinance 373.13. The statutes further state that "[a] lamp emitting red light visible from a distance of five hundred feet to the rear may be used in addition to the red reflector." *Id.* When prompted, the Government could not present any evidence that any red reflectors exist which have been approved by the West Virginia Department of Highways. Meaning, there are currently no red reflectors required by the statute.

Further, based on the evidence, it is ambiguous whether the red lamp here was also a red reflector. According to Mr. Davis, he used "a battery operated red rear reflector/light that his girlfriend purchased off the internet." Def. Mem. in Support [ECF No. 32] 4. Mr. Davis testified that he used the red rear light "as a secondary reflector," and that "the rear reflector" was attached to the bike at the time of the October 4 stop. *See* Tr. Mot. Suppress 49:8–24 ("Q. Was the rear reflector attached to the bike at that time? A. Yes, sir."). Indeed, during Mr. Davis's encounter with Parkersburg Police the week prior, the police mentioned nothing about a lack of a rear red reflector. *See* Ex. List [ECF No. 29–3]. In addition, I find that in the photographs provided to the court of the bicycle, it appears the red rear light could be a reflector. *See* Ex. List [ECF No. 29–2] 21–23. Without any guidance of what types of rear reflectors are approved by the West Virginia Department of Highways, I find

---

Tr. Mot. Suppress 50:6–13.

15

there is not sufficient evidence that Mr. Davis was violating the statute here, nor do I find that there are any red reflectors currently required by the statute. Officer Kashorek testified that he pulled over Mr. Davis because he saw him without a head lamp while he sat in the alleyway where it was legal to do so. The Government's post hoc rationalizations of the stop regarding the red reflector are without merit. *See United States v. Foster*, 824 F.3d 84, 89 (4th Cir. 2016) ("[T]he Government cannot rely upon post hoc rationalizations to validate those seizures that happen to turn up contraband.").

Next, I must address whether Mr. Davis's flight from police provided reasonable suspicion for the stop.

Flight alone is not enough to establish reasonable suspicion, but is a factor in the reasonable suspicion analysis. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."); *see also Fla. v. Bostick*, 501 U.S. 429, 437 (1991) ("We have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."); *United States v. Brown*, 925 F.3d 1150, 1155 (9th Cir. 2019) ("[T]he Supreme Court has never endorsed a per se rule that flight establishes reasonable suspicion."). Indeed, the "Court has a long history of recognizing that innocent people may reasonably flee from the police." *Brown*, 925 F.3d at 1155 (*citing Alberty v. United States*, 162 U.S. 499, 511 (1896)). Furthermore, "when an officer insufficiently or unclearly identifies his office or his mission, the

occupant's flight…must be regarded as ambiguous conduct." *Wong Sun v. United States*, 371 U.S. 471, 482 (1963).

There is no dispute here that Officer Kashorek activated his emergency lights and Mr. Davis continued to ride his bicycle. However, it is disputed whether a reasonable person in Mr. Davis's position would know that the officer was trying to pull him over. Mr. Davis testified that he didn't realize he was being stopped until after he was tackled because he knew he wasn't doing anything wrong. Officer Kashorek testified that he did not use his sirens, his intercom, or roll down his window and yell to alert Mr. Davis that he was being pulled over, even though he was driving roughly 20 miles per hour. Mr. Davis testified he never heard police tell him to stop. I find the evidence is ambiguous whether a reasonable person in Mr. Davis's position would know to pull over based on Officer Kashorek's conduct. *See Wong Sun*, 371 U.S. at 482 ("[W]hen an officer insufficiently or unclearly identifies his office or his mission, the occupant's flight…must be regarded as ambiguous conduct."); *see also Brown*, 925 F.3d at 1155 ("Notably, the officers did not communicate with [Defendant], use their speaker to talk with him, or tell him to stop before they flashed their lights and then detained him. Under these circumstances, Brown had no obligation to stop and speak to an officer."); *see also Goodman v. State*, 280 So. 3d 537, 542 (Fla. Dist. Ct. App. 2019) ("It is not enough to establish that an individual perceived an officer's nonverbal cue if there is nothing to support that the individual understood it as a command for him to stop.").

17

However, Officer Kashorek also testified that at some point while he was pursuing Mr. Davis, he opened his cruiser door and asked him to pull over and stop. This information was not included in Officer Kashorek's police report. Mr. Davis has testified that he never heard any verbal commands from Officer Kashorek until he was tackled. I recognize that police officers are not "essayists" and their police reports are not to be "scrutinized like a work of literature." Govt. Br. [ECF No. 30] 2. But given that the Government is arguing that probable cause was provided for the arrest of Mr. Davis because he violated West Virginia Code 61-5-17(d) for fleeing from an officer, it seems imperative that this crucial fact establishing whether Mr. Davis ignored a verbal command from the police to stop would be included in the report. The report, which was written when Officer Kashorek's memory was fresh from the incident, states that Officer Kashorek "gave loud repeated verbal commands" after he tackled him, but says nothing about him opening his door to tell Mr. Davis to stop prior to this. Therefore, I credit Mr. Davis's testimony as to this fact.

In addition, Mr. Davis argues that "[t]he 'chase' goes on for, at best, two blocks with Davis at all times remaining on wide, paved surfaces (rather than attempting to navigate areas where Kashorek couldn't follow in his cruiser) and at speeds that Kashorek is easily able to keep up with." Def. Mem. Mot. Suppress [ECF No. 32] 12. "It is likewise undisputed that Davis did not try to jump a fence, cut through a yard, or otherwise evade Kashorek by taking his bicycle somewhere that Kashorek's cruiser could not follow." *Id.* at 11.[8] This is in contrast to *Holley* where besides not stopping

---

[8] Officer Kashorek testified to the following at the Suppression Hearing:

for police, Holley was driving erratically. *See Holley*, 602 F. App'x at 107 (justifying the seizure of Defendant because "the Cadillac's initial failure to stop when McArthur activated his siren and McArthur's observations regarding the Cadillac's subsequent erratic driving, it is clear that the reasonable suspicion standard is met"). Here, there is no evidence that Mr. Davis was swerving or driving in any sort of erratic manner. I do not find probable cause existed to arrest Mr. Davis for fleeing from the police, and therefore the search incident to the arrest was not valid.

## IV. Conclusion

For the foregoing reasons, the defendant's Motion to Suppress [ECF No. 24] is **GRANTED.** The court **DIRECTS** the Clerk to send a copy of this Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER: March 19, 2020

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

---

Q. Now, during the chase that you characterized as a chase, at no time did the bike attempt to maneuver into any area where your cruiser couldn't go; is that fair? A. At the end of the alley, right at your last corner before he turned into there, there's that small parking lot right there. Can you see where I'm indicating? He made a loop in there and I had to make a three-point turn to get back behind him in the alley. Q. But you were able to get your car into the parking lot and you were able to get your car behind him in the alley, correct? A. Yes. Q. He didn't jump any fences, right? A. No. Q. He didn't ride through anybody's yard, right? A. No. Q. He didn't ride between any trees or anything like that correct? A. Correct.

Tr. Mot. Suppress 36:5–23.